FILED
99 JUN 30 PM 3:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
JUN 3 0 1999

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHARON K. CUMMINS, and )
CARLA LANTHRIP, )
     Plaintiffs, )
v. ) CV-98-AR-0036-S
AUTOZONE, INC., )
     Defendant. )

### MEMORANDUM OPINION

Presently before the court is a motion for summary judgment by defendant, AutoZone, Inc. ("AutoZone"). Plaintiffs, Sharon K. Cummins ("Cummins") and Carla Lanthrip ("Lanthrip"), bring the present action pursuant to Title VII of the Civil Rights Act of 1964, 28 U.S.C. § 2000e et seq. ("Title VII") to redress alleged sexual harassment and retaliation. Lanthrip also makes claims under state law for invasion of privacy, battery, and negligent retention.

### Some Disputed and Some Undisputed Material Facts

Carla Lanthrip ("Lanthrip") began employment for AutoZone sometime in July, 1996 at its Jasper, Alabama store. Over the course of her employment up until she resigned in April, 1997, Lanthrip alleges that AutoZone's store manager, Alton Vick ("Vick"), continuously harassed her sexually. Among Lanthrip's



allegations is her claim that Vick requested her to dance naked for him, to visit him at home while his wife was out of town, and to clean his house while wearing a "french maid" uniform. She also alleges that he touched her in unwelcome fashion on many occasions, sometimes holding her hands, sometimes rubbing his body against her, sometimes whispering in her ear.

On or around March 27, 1997, Lanthrip complained about Vick's behavior to Pam Polk ("Polk"), a mid-level manager at AutoZone. Polk spoke about the matter with the only other female manager at the store, Sharon Cummins ("Cummins"). In turn Cummins, displaying poor judgment, reported the allegations to Vick, the alleged harasser. AutoZone's promulgated policy about sexual harassment states that employees who become aware of allegations of sexual harassment must tell their direct supervisor, another member of management, or "AutoZoner relations." *Cummins depo.*, at 229. Although relaying the allegations directly up the management chain may have been inappropriate for several reasons, it clearly fits the policy's requirements. Vick immediately notified Bruce Sherer, district manager, who initiated a prompt investigation.

Lanthrip was placed on paid leave while Sherer and others interviewed employees at the Jasper store. Vick was allowed to continue working. After taking statements from several employees, including Lanthrip and Vick, Sherer determined that

there was insufficient evidence to justify disciplining Vick. Because Vick admitted to having made a statement to the effect that he "felt like a young man" when his wife was out of town, he was reprimanded, but this discipline had nothing to do with Lanthrip's allegations. The investigation also revealed that Lanthrip had once engaged in an inappropriate conversation with other employees, in which she joked about the possibility of having a surgical "boob job." She and the several male employees who participated in the conversation were issued written reprimands. Her reprimand warned Lanthrip that she faced potential termination if such conduct recurred. Cummins was demoted from her position as Assistant Manager to a sales position, purportedly because she exercised poor judgment when she informed Vick of the allegations against him.

After Lanthrip's complaint and Sherer's investigation, Lanthrip alleges that she suffered retaliation in several forms. For instance, she complains that she was denied appropriate care and attention when she injured her foot at the store, that she was denied unscheduled breaks when business was slow, even though other employees were allowed such breaks, and that she was no longer permitted to leave early two days a week in order to pick up her son from school. The discipline Lanthrip received for her "boob job" comment might also be construed as retaliatory, given that other employees cursed frequently at the store, using words

like "damned" and "fuck," but unlike Lanthrip they were never disciplined for inappropriate language. Vick himself used the word "fuck" on a "weekly or daily" basis, *Alexander depo.*, p. 46, and was in the habit of commenting on the "ass" and "boobs" of female customers. *Id.* Again, unlike Lanthrip's comment, such inappropriate language by Vick went unchecked. Understandably, such disparate treatment suggested to Lanthrip that she was being subjected to retaliation. Cummins even reported to Lanthrip that the new assistant manager, Tom Morgan, had commented that he would see to it that Lanthrip resigned. *Cummins depo.*, p 195. Cummins' own demotion also fit the suspected pattern of retaliation.

 Rumors began to circulate that Lanthrip had engaged in a sexual affair with a co-employee. It is unclear when these rumors started - they may have begun even before Lanthrip complained about Vick's behavior, but it is undisputed that the gossip was untrue. In any case, Lanthrip did not become aware of the rumors until after the first investigation. Lanthrip's husband phoned Sherer directly to complain about the rumors, and Sherer launched a prompt investigation. Again Sherer and other AutoZone investigators determined that there was insufficient evidence to discipline any alleged harassers.

 In the interim between investigations, a former employee, Judy McGruff, had learned of Lanthrip's allegations against Vick.

It is unclear from the record exactly how or from whom McGruff heard about Lanthrip's circumstances, although it appears that she spoke with two employees, Larry Earnest and Eric House, or with Earnest's girlfriend. McGruff came forward and made similar allegations of sexual harrassment against Vick. In a telephone conversation with Cummins, McGruff detailed harassment which purportedly led her to resign from AutoZone, although it is undisputed that McGruff did not report the alleged harassment to AutoZone management while employed there. Cummins appears to have encouraged McGruff to contact Lanthrip, and to that end Cummins provided Lanthrip's phone number to McGruff.

During the second investigation, Sherer held a conversation with McGruff, in which she repeated her allegations of sexual harassment. McGruff also showed a napkin to Sherer on which Vick allegedly had drawn a map to his house, after propositioning her and inviting her to his home while his wife was out of town. McGruff later refused to speak with AutoZone investigators a second time, and AutoZone argues that her noncooperation resulted from Lanthrip's direct intereference. Essentially because McGruff would not submit to this second interview, and because she would not hand over the napkin or a photocopy of it to Sherer, AutoZone appears largely to have disregarded her allegations which arguably tended to show that Lanthrip's allegations against Vick were true.

After the second investigation was complete, AutoZone terminated Cummins, ostensibly because she had displayed poor judgment when she gave Lanthrip's publicly available phone number to McGruff.  AutoZone contends that Cummins interfered with its internal investigation, as demonstrated by the fact that McGruff refused to cooperate after she had spoken with Lanthrip.  No other employees were disciplined for having spoken with McGruff about Lanthrip's allegations.

After the second investigation, Sherer offered to accommodate Lanthrip by transferring her employment to another AutoZone store, located roughly an hour's drive away in Forrestdale, Alabama.  Alternatively, he offered to allow her to continue working at the Jasper store.  Although AutoZone contends that it would have reimbursed Lanthrip's additional expenses resulting from a lengthy commute, there is no evidence to show that such willingness was communicated to Lanthrip.  Lanthrip refused both options and resigned.  AutoZone also contends that Lanthrip's final, post-investigation conversation with Sherer left open the possibility that Lanthrip would opt to work in Forrestdale, and apparently Lanthrip's employee file was forwarded to that store in case she so opted.  Lanthrip, on the contrary, understood her conversation with Sherer to end with a conclusive resignation.

Lanthrip and Cummins filed the present action in January,

1998, after having received a right to sue under Title VII from the Equal Employment Opportunity Commission.

<u>Initial Analysis</u>

Although this court's custom, when denying motions for summary judgment, is to write only an abbreviated opinion or none at all, the court finds it appropriate in this case to spell out the situation to the parties. AutoZone's briefs in support of its motion for summary judgment repeatedly intone that it had no evidence to support claims of harassment and that it did all that it could to redress plaintiffs' concerns. The accuracy of its contentions depends, to a great extent, upon credibility determinations which are not permitted to this court at the summary judgment stage. The court is tempted here to find that AutoZone could not, consistent with Rule 11, deny the existence of substantial evidence to support plaintiffs' claims. The court will resist the temptation, however, and will pass that responsibility to the jury.

The court's caution is motivated by its awareness that the present case involves issues of vicarious, rather than direct, liability. AutoZone's defenses do not fall on deaf ears. What more can a court require of a defendant employer if it vigorously investigates allegations of sexual harassment, if it unequivocally states a company policy against harassment, if it

determines not to discipline its accused employees when evidence really is lacking, and if it offers the only accommodations it knows how? If all these things were true, the court would join AutoZone in asking, rhetorically, "What more could possibly have been done?" Undoubtedly an employee could sue a co-employee for sexually harassing behavior which falls under traditional categories of tort liability. Courts must be reluctant to impose vicarious liability upon an employer in cases where the employer did not know of the harassment, or had no reason why it should have known, or where such an employer has been given insufficient opportunity to remedy the situation.

Based upon the multitude of allegations of sexual harassment, supported by the various depositions on record, it appears that such routine reluctance to impose vicarious liability does not apply in this case. Both plaintiffs have so clearly made out *prima facie* cases of harassment and/or retaliation that AutoZone will have a difficult time defending itself with all of its protestations of innocence.

Central to AutoZone's defense is its contention that it could not find sufficient evidence of harassment to justify taking disciplinary action. The court finds that a reasonable jury could conclude that AutoZone looked for what it hoped to find and found only what it hoped for. For instance, Sherer ignored the napkin produced by McGruff, which corroborated

Lanthrip's allegations. As an excuse, Sherer states "I can't analyze someone's handwriting." *Sherer depo.*, p. 95. Plaintiffs' counsel challenged Sherer about the napkin, as follows:

    Q.  But she [McGruff] had written evidence?
    A.  She wouldn't give it to us.
    Q.  But you saw it?
    A.  I saw it, but I don't have it in front - to put in front of anybody else.

*Sherer depo.*, p 109.

Sherer acts as though he were free to ignore information which directly tended to prove a pattern of harassment. He was not free. As another example of AutoZone's willingness to overlook inconvenient information, Sherer admits that AutoZone never even asked male employees, like Larry Earnest, whether they had communicated with McGruff about the ongoing investigations, despite the fact that AutoZone had reason to know that such communications had taken place, and despite the fact that Cummins was terminated for the same or similar conduct. *Sherer depo.*, pp. 82, 89-90, 98-100. When Eric House denied "engaging" McGruff in conversation about the allegations, AutoZone apparently accepted his denial at face value. *Id.*, at 82.

In fact, the sexually hostile environment in Jasper may have been so pervasive that AutoZone ought, as a matter of law, to be held to have had constructive knowledge of it. If, for instance, Billy Alexander's deposition testimony is to be believed,

AutoZone should have been aware of Vick's drug usage at the store and about his constant inappropriate, sexually explicit behavior. For instance, Alexander reports that Vick sometimes paraded around the store waiving a radiator hose in front of his pants and referring to himself as "Big dick Vick" or "BDV." Such conduct was open and known to multiple employees, if not to all of them. According to Alexander, "[E]verybody in the store heard him use those initials and all. He told them what it stood for." *Alexander depo.*, p. 26. Alexander also reports that Vick harassed other female employees, like Mary Fisk, by asking "to have a threesome with his wife and be a swinger." *Id.*, at 24. It is true that Alexander did not report Vick's inappropriate conduct during AutoZone's initial investigation, purportedly because Vick had threatened Alexander's job. *Id.*, at 28. However, if the environment and culture of sexual harassment at AutoZone truly existed to the extent described by Alexander, AutoZone could easily be held to have had constructive knowledge of the harassment, even in the absence of actual knowledge.

In short, if a jury accepts as true the allegations of sexual harassment and retaliation presented by plaintiffs, the environment at AutoZone's Jasper store must have been so hostile and inexcusable that AutoZone's claimed inability to detect it raises serious questions of credibility.

### Lanthrip's Claims Under Title VII

A constructive discharge occurs when working conditions become so intolerable that a reasonable person under the same circumstances would be compelled to resign. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1997). This court has rarely seen a viable claim for constructive discharge. More often than not it grants summary judgment where the evidence is insufficient to allow a reasonable jury to find "compulsion" to resign. In the instant action, however, the court finds that Lanthrip presents the rare exception.

There are several material factual disputes related to constructive discharge. Even though AutoZone offered to transfer Lanthrip to another store, it remains an open question as to whether it would have been unreasonable to expect her to commute an additional two hours per day, even if she were compensated for the added commuting expenses. It likewise remains an open factual question as to whether it would have been unreasonable to expect Lanthrip, if she had declined a transfer, to remain on the job with the alleged harassers in the allegedly hostile environment. If the harassment was as she contends, a jury might conclude that no reasonable person could be expected to continue working in such an environment or for such an employer, even if offered a possibly unreasonable option of transferring to another, distant store. Despite this court's usual reluctance to

find that circumstances exist which could support a claim of constructive discharge, the current case contains evidence, which, if believed by a jury, could lead the jury to find that AutoZone constructively discharged Lanthrip from her employment at the Jasper store.

Having found that a material factual dispute remains as to whether Lanthrip was constructively discharged, AutoZone is precluded from relying upon the affirmative defenses otherwise available under *Faragher v. City of Boca Raton*, 118 S.Ct. 2275 (1998)("Faragher"), and *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2557 (1998)("Burlington Industries").

Under *Faragher* and *Burlington Industries*, an employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with authority over the complaining employee. While creating vicarious liability, these cases also articulate an affirmative defense by which employers can avoid liability for its supervisors' harassment:

> <u>When no tangible employment action is taken</u>, a defending employer may raise an **affirmative defense** to liability or damages, subject to proof by a preponderance of the evidence... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, at 2293; *Burlington Industries*, at 2270. (emphasis added).

The *Faragher/Burlington Industries* defense is not available "when the supervisor's harassment culminates in tangible employment action." *Burlington Industries*, at 2270. Whether a constructive discharge constitutes "tangible employment action" is therefore central to the question of AutoZone's potential vicarious liability. It is true that a normal voluntary resignation would not qualify as a "tangible employment action" for purposes of *Faragher* and *Burlington Industries*. However, one federal district court argues persuasively that:

> [I]f the employer made working conditions so intolerable that the employee was "forced" to resign, courts can recognize that a constructive discharge occurred, and that is a tangible employment action.

*Jones v. USA Petroleum Corporation*, 1998 WL 655581 (S.D.Ga. 1998).

If a jury determines that Lanthrip was constructively discharged, such a constructive discharge would constitute a tangible, adverse employment action as a matter of law. In that event, AutoZone would be precluded from offering a defense based upon *Faragher* and *Burlington Industries*. For this reason alone, summary judgment is inappropriate.

Even if no constructive discharge were found, *Faragher* and *Burlington Industries* may remain beyond reach to AutoZone. To make out a successful affirmative defense, AutoZone would have to show two things: first, that it exercised reasonable care to

prevent and correct promptly any sexually harassing behavior; and second, that Lanthrip either unreasonably failed to take advantage of any preventative or corrective opportunities provided by AutoZone or that she unreasonably failed to avoid harm otherwise. *Burlington Industries*, at 2270. AutoZone has presented substantial evidence of its prevention policies, which include periodic training seminars, written policy statements, and promulgation of employee handbooks. As a matter of law, the court finds that AutoZone's efforts to <u>prevent</u> sexual harassment are sufficient to satisfy the burden imposed by *Faragher* and *Burlington Industries*. However, whether AutoZone acted reasonably to <u>correct</u> the alleged harassment, and whether Lanthrip acted reasonably in choosing to quit, rather than accepting a transfer or continuing to work with alleged harassers, remain disputed questions. Just as these disputes prevent summary judgment on the constructive discharge claim, they prevent application of the *Faragher/Burlington Industries* affirmative defense on all of Lanthrip's claims under Title VII at the summary judgment stage.

<u>Cummins' Claims Under Title VII</u>

As discussed above, the court finds that a reasonable jury could find the environment at AutoZone's Jasper store to have been pervasively hostile. This alone would support a claim by

Cummins for actionable sexual harassment. The record also indicates that Vick's harassing or sexually explicit comments were at times also aimed directly at Cummins, not just at Lanthrip, McGruff, Fisk, or female customers. *See, e.g. Alexander depo.*, p. 40. Cummins' retaliation claim is stronger still, because her *prima facie* case creates a heavy presumption of discrimination. Prior to Vick becoming store manager, Cummins had a long history of good or excellent performance reviews. In fact, she had been twice promoted. After Vick became her supervisor, she began getting bad reviews. After Cummins initially reported Lanthrip's allegations of harassment, she was demoted for violating company policy, even though it is by no means clear that AutoZone's sexual harassment reporting policy compelled her to do anything other than what she did. Between the fall of 1996 and spring of 1997, both female managers had been demoted, although no male managers had been so disciplined. Finally, Cummins was fired, purportedly because she discussed Lanthrip's allegations with McGruff (violating confidentiality policy and interfering with the ongoing investigation), but AutoZone did not terminate or otherwise discipline the two male employees who had apparently also spoken with McGruff about the same subject. A reasonable jury could conclude that Cummins, who while assistant manager had once confronted Vick about his conduct, became a target of retaliation, and that AutoZone was

all too ready to discipline her while simultaneously turning a blind eye to the harassment, complicity, or policy violations of its male employees. AutoZone attempts to articulate a nondiscriminatory reason for Cummins demotion and subsequent termination - her allegedly poor management judgment, but there clearly is more than enough evidence in the record to support a jury finding that such an excuse is pretextual.

### Lanthrip's Claims Under State Law

Lanthrip additionally makes claims under Alabama legal theories. Two of these claims again involve vicarious liability for the conduct of Vick - battery and invasion of privacy, both of which are intentional torts. The court initially acknowledges the long-standing maxim of tort law that an employer is liable for the actions of its agent taken within the scope of employment. As a usual matter, intentional torts are found to be outside the scope of employment, and so there exists an initial presumption that AutoZone could not be liable for the alleged battery or invasion of privacy by Vick. Alabama recognizes certain circumstances, however, in which the employer may be held liable for its employee's intentional tortious conduct:

> For [an employer] to become liable for [the] intentional torts of its agent, the plaintiff[] must offer evidence that [1] the agent's wrongful acts were in the line and scope of his employment; or [2] that the acts were in furtherance of the business of [the employer]; or [3] that [the employer] participated in, authorized, or ratified the wrongful acts.

*Potts v. B.E. & K.Const. Co.*, 604 So.2d 398, 400 (Ala. 1992)("*Potts*"), *quoting Joyner v. AAA Cooper Transportation*, 477 So.2d 364, 365 (Ala. 1985).

AutoZone could not be found liable under rule (1) or (2) above, because Vick's alleged battery and invasion of privacy could not have been (and are not alleged to have been) within the scope of his employment, nor could they have been committed in furtherance of AutoZone's business interests. However, the *Potts* decision makes clear that an employer is <u>directly liable</u>, not vicariously liable, "if it authorizes or participates in the employee's conduct after it learns of the action." Id. This court has already determined that AutoZone's promulgated anti-harassment policy did not authorize in advance Vick's alleged conduct. However, also as discussed above, a reasonable jury could determine that AutoZone knew or should have known about the conduct alleged, but did nothing about it. Indeed, the court considers it an open question whether AutoZone deliberately investigated the allegations with a willingness to overlook the truth. If AutoZone's investigation and remedial efforts were, as a matter of fact, so insincere, a jury might determine that AutoZone "ratified" the behavior. Under the *Potts* rule, AutoZone would be directly liable for harassment as if Vick had acted as its agent, as if the scope of his employment had expanded to include illegal conduct. For these reasons, Lanthrip's claims for both the intentional torts remain viable as against AutoZone,

as a matter of <u>direct</u>, not vicarious, liability.  Without further discussing the merits of each tort claim, the court finds that sufficient evidence exists in the record to support a jury finding of liability on all three tort claims - battery, invasion of privacy, and negligent retention.

## Conclusion

For the reasons set forth above, the court determines that AutoZone's motion for summary judgment is due to be denied.  A separate and appropriate order will be entered.

DONE this _30th_ day of June, 1999.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE